## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| BTG Pactual Commodities (US) LLC, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:14-cv-03704 |
| | § | |
| EDF Trading North America LLC, | § | |
| Defendant. | § | |

## MOTION IN LIMINE STRIKING PORTIONS OF
## BTG'S EXPERT DAMAGE CALCULATION

Defendant EDF Trading North America LLC "EDF") moves in limine to preclude testimony from Plaintiff BTG Pactual Commodities (US) LLC's ("BTG") damage expert on those portions of his  damage calculation that are not consistent with the liquidated damage provision and damage limitation provision in the parties' proposed contract.

## SUMMARY

There are two principal issues in this litigation: whether a contract for the sale of coal was agreed by the parties (which EDF disputes), and what the proper calculation of damages would be if the trier of fact determines that a contract for the sale of coal was agreed.  The parties have previously briefed the contract formation issue in the summary judgment briefing: BTG alleges that the parties agreed on the required contract and credit terms; EDF disagrees and will show at

trial that no agreement was reached.

This motion is directed toward the proper method of damage calculation in the event the trier of fact concludes a contract was formed, and specifically to exclude BTG's $6,517,720 damage calculation as improper under the liquidated damage provision and damage limitation contained in the parties' proposed contract. The contract forms exchanged by the parties provided that these damage provisions were the **exclusive** remedies for any breach of contract. BTG's $6,517,720 damage calculation is *more than ten times* the amount of BTG's expected profit on the contract. This calculation relies on changes in market conditions that occurred from January to December 2015 and does not calculate damages as of December 18, 2014, the date that BTG contends the contract was repudiated. If there is a contract, BTG has to live or die by the contract's express terms. BTG should not be permitted to present a damage calculation that is inconsistent with the agreement's very terms.

## NATURE AND STAGE OF THE PROCEEDING

This is a breach of contract action arising out of EDF's timely cancellation of a brokered coal transaction with BTG. Under the Scheduling Order (Dkt. 18), discovery in this lawsuit closed on February 29, 2016, although, by agreement, EDF did not depose BTG's damages expert Saul Solomon until May 18, 2016. BTG filed for partial summary judgment on March 7, 2016. Dkt. 37. The Court

4358633v1/014664

denied BTG's motion on June 6, 2016. Dkt. 49. This matter is set for trial on June 27, 2016.

## FACTUAL BACKGROUND

BTG claims that it had an agreement to sell 528,000 tons of coal to EDF at $56.50 per ton. To supply the coal for EDF, BTG entered into a deal with Revelation Energy LLC ("Revelation") on December 1, 2014 to purchase 528,000 tons of coal at $55.65 per ton. Exhibit A; Exhibit B; Exhibit C, Shoop Depo. at 49:13-53:15.

On December 11, 2014, BTG modified its deal to purchase coal from Revelation. Specifically, BTG increased its first quarter 2015 purchases from Revelation to a total of 330,000 tons at $54.50 per ton. Exhibit D. This new agreement also included third-party purchaser contingency language that permitted BTG to cancel the transaction with Revelation if any downstream coal purchaser "has defaulted or otherwise failed to perform" under the terms of its agreement with BTG. *Id.* ¶ 17 (BTG_001480).

BTG intended for the Revelation coal purchase to supply the volumes needed for the purported EDF sale:

> Q. So to the extent BTG was obligated to physically deliver coal to EDF, would you agree that the only coal that was available that had actually been purchased by BTG was the coal transaction with Revelation Energy?
> A. Yes.

4358633v1/014664

Exhibit C, Shoop Depo. at 53:10-15.

The difference in the purchase price BTG agreed to pay to Revelation for the coal and the sale price BTG expected to receive from EDF was $600,600. BTG confirms this calculation in its own internal documents. Exhibit E at BTG_001457, Exhibit F. Despite only standing to gain $600,600 in profit if EDF had fully performed under its purported contract with BTG (less any costs associated with the contract's performance), BTG offers two damage models for many multiples of that loss. One model calculates BTG's loss as of December 18, 2014, the date that BTG claims that EDF repudiated the coal sale agreement. Exhibit N, Solomon Depo. at 44:14-16 ("The issue, again, becomes what would the market price of those volumes be as of December 18th of '14, which was the repudiation date."); Dkt. 26 ¶¶ 13-15. The December 18, 2014 damage model calculates damages by subtracting future monthly market prices for coal over the calendar year 2015 as of the date BTG claims EDF breached the contract from the EDF transaction price of $56.50 per ton. Dkt. 32 ¶ 7. This damage model totals $2,435,400, excluding prejudgment interest.[1] *Id.*

The second model, which is the subject of this motion, does not calculate damages as of the date of claimed breach. Instead, that damage model relies on the drop in coal prices that occurred during 2015 and calculates damages using the

---

[1] While EDF believes there are flaws with BTG's $2,435,400 damage theory as well, EDF does not move to limine out that damage theory.

actual final monthly average Platts OTC Broker Index coal price for each month in 2015, even though those actual prices were not available on December 18, 2014, the date BTG claims EDF breached the contract. *Id.* ¶ 17. Under this model, BTG's damages expert determined this damage calculation to be $6,517,720 before interest. *Id.* ¶ 18.

BTG claims it agreed with EDF to pursue an ISDA master agreement to govern the coal transaction and has alleged in its Second Amended Complaint that the ISDA master agreement, with supporting Coal Annex, is the governing document for the parties' transaction. Exhibit G at BTG_000899-900; Dkt. 26 ¶ 11. The Coal Annex contains a damage limitation clause and a liquidated damages provision for failure "to accept delivery of *all or part* of the Contract Quantity in accordance with the applicable Coal Transaction." Exhibit H Appendix 1 § (3)(B)(ii) (EDF-001624) (emphasis added). The Coal Annex further specifies that its liquidated damages provisions for buyer and seller are a party's "*exclusive remedies* for the other party's failure to deliver or receive a Shipment of Coal Product as set forth in this Coal Annex. *Id.* at § (3) (EDF-001623) (emphasis added). Under these provisions, if a buyer fails to accept delivery of all or part of the contracted quantity of coal, the seller is entitled to the contract price minus "the commercially reasonable market price at which Seller is able, or absent an actual sale, would be able [], to sell or otherwise dispose of the Coal Product *at the time*

*of Buyer's breach* ('Sales Price')." [2]  *Id.* § (3)(B)(ii) (EDF-001624) (emphasis added).

The Coal Annex also contains a limitation of liability provision that states, "IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED HEREIN OR IN A COAL TRANSACTION, THE OBLIGOR'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY."  *Id.* § (f). When it provided comments and revisions to EDF's form schedule to the ISDA master agreement and Coal Annex, BTG did not modify either the liquidated damage or the limitation of liability provision in the Coal Annex. Exhibit K; Exhibit L, Kent Depo. at 73:9-77:7.

## STATEMENT OF ISSUES AND STANDARD OF REVIEW

The issue presented is whether a party may assert a damage model that has no relation to the damage provisions contained in the purported contract.  To be admissible, expert opinion testimony must be based on sufficient facts or data. FED. R. EVID. 702(b); *Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513, 515 (5th Cir.

---

[2] On November 3, 2014, EDF told BTG that it wanted to proceed under an ISDA master agreement with a coal annex as the form of contract for the deal.  Exhibit G at BTG_000900.  Instead, BTG forwarded EDF a long-form confirmation for the transaction on November 5, 2014.  Exhibit I.  On November 13, 2014, EDF informed BTG that EDF would only proceed with this transaction if the parties could agree to an ISDA master agreement.  Exhibit J at BTG_001035.  BTG consented to the ISDA and subsequently provided comments on EDF's form schedule to the ISDA master agreement.  Exhibit K.

Nevertheless, if the trier of fact determines that BTG's long-form confirmation governs this transaction, the same liquidated damages provision can be found in BTG's General Terms and Conditions at § II(F)(2)(b), and the same limitation of liability provision can be found in BTG's General Terms and Conditions at § IX(F). Exhibit R at BTG_000661, BTG_000669-70.

4358633v1/014664

2013). "Expert testimony that relies on completely unsubstantiated factual assertions is inadmissible." *Id.* (citation omitted). "When an expert's testimony is not based upon the facts in the record but on altered facts and speculation designed to bolster a party's position, the trial court should exclude it." *Id.* (citation omitted).

Rule 702 further requires that the evidence or testimony at issue "assist the trier of fact to understand the evidence or to determine a fact in issue." *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 275 (5th Cir. 1998). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful," and should be excluded. *Id.*

## ARGUMENT

EDF does not believe a contract exists with BTG, but to the extent the trier of fact determines that a contract between the parties did exist for this coal transaction, BTG's $6,517,720 damage calculation has no basis in the applicable damage clauses in the purported contract, and for this reason should be stricken. *See, e.g.*, *Platinum Partners Value Arbitrage Fund LP v. Kroll Assoc., Inc.*, 102 A.D.3d 483 (1st Dep't 2013)[3] (breach of contract "claim is subject to the limitation of liability clause in the retainer agreement, which limits any recovery to the fees plaintiff paid defendant").

---

[3] The parties agree New York law governs this transaction.

4358633v1/014664

**A.    BTG's $6,7517,720 damage calculation does not comport with the Coal Annex's "exclusive remedy," the Liquidated Damages clause.**

BTG's $6,517,720 damage calculation violates the liquidated damages clause in the Coal Annex to the ISDA master agreement, BTG's alleged contract. Dkt. 26 ¶ 11. New York courts have held that liquidated damages clauses are enforceable, so long as "the amount liquidated bears a reasonable proportion to the probable loss and the amount of actual loss is incapable or difficult of precise estimation." *Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 425 (1977). "Where the court has sustained a liquidated damages clause the measure of damages for a breach will be the sum in the clause, no more, no less." *JMD Holding Corp. v. Cong. Fin. Corp.*, 4 N.Y.3d 373, 379 (2005).

An ISDA master agreement may cover transactions between parties in a number of commodities, including coal; the Coal Annex is an addendum to the ISDA master agreement that *specifically governs* transactions, such as this one, that involve physical delivery of coal. Exhibit H § (a)(i) (EDF-001608) ("The provisions of this Coal Annex shall apply solely to transactions between the parties for the purchase or sale of physical Coal Products on a spot or forward basis . . . . All Coal Transactions will be deemed to have been entered into in accordance with the terms of this Agreement"). The Coal Annex specifies that its liquidated damages provisions are a party's "*exclusive remedies* for the other party's failure

to deliver or receive a Shipment of Coal Product as set forth in this Coal Annex. *Id.* Appendix 1 § (3) (EDF-001623) (emphasis added).

Under the Coal Annex, "if Buyer fails to accept delivery of *all or part* of the Contract Quantity in accordance with the applicable Coal Transaction," the seller is entitled to the contract price minus "the commercially reasonable market price at which Seller *is able*, or absent an actual sale, *would be able* [], to sell or otherwise dispose of the Coal Product at the time of Buyer's breach ('Sales Price')." *Id.* § (3)(B)(ii) (EDF-001624) (emphases added). In other words, there are two ways of approaching the Coal Annex's Sales Price: the commercially reasonable market price at which Seller *is* able to re-sell the transaction coal, or the commercially reasonable market price at which the Seller *would be able* to re-sell the transaction coal.

BTG sold coal to Peabody and RWE shortly before EDF cancelled the transaction. Exhibit F, Exhibit M; Exhibit C, Shoop Depo. at 56:8-57:20. These sales provide examples of "actual sale[s]" prices at which BTG could have reasonably sold coal intended for EDF. Using the average market price of the Peabody and RWE transactions, EDF's expert Rob Hancock calculated damages under the Coal Annex's liquidated damages provision as $190,000. Dkt. 35-1 at n.26.

BTG expert Saul Solomon's $6,517,720 calculation is not consistent with

the liquidated damage provision in the contract. This calculation purports to determine "expectation damages measuring the actual economic benefit BTG would have earned had EDF performed under the CSX contract." Dkt. 32 ¶ 5. Contrary to the written contracts that BTG had for the purchases of coal from Revelation and sworn testimony from Mr. Shoop, Mr. Solomon claims that pursuant to conversations with BTG's John Massey, BTG "likely would have purchased coal on a monthly basis to cover the volumes required" under the EDF contract. *Id.* ¶¶ 6, 17. Accordingly, "[t]he cost of the coal purchased over the term of the CSX Contract to BTG would therefore incorporate the decline in the market prices for coal that occurred during 2015 under the Loss of Bargain method." *Id.* ¶ 6. Mr. Solomon concludes that this calculation would yield $6,517,720 in damages before interest, or $7,058,617 adding prejudgment interest at 9%.

BTG's $6,517,720 damage calculation is unsupported by the Coal Annex's language that requires calculation of loss **at the time of breach**, which is, according to BTG, December 18, 2014. Dkt. 26 ¶¶ 13-15. The liquidated damages provision further provides that the relevant price is the price at which BTG would have been able to "sell or otherwise dispose of the Coal Product at the time of Buyer's breach." Exhibit H Appendix 1 § (3)(B)(ii) (EDF-001624). But BTG's $6,517,720 damage calculation violates both of these requirements. *First*, rather than calculating the price at which BTG would have been able to sell coal intended

4358633v1/014664

for EDF *at the time of EDF's alleged breach*, BTG's $6,517,720 damage calculation uses after-the-fact hindsight by incorporating actual 2015 prices for coal that would not be known until the end of 2015, as Mr. Solomon conceded in his deposition:

> Q. And the date of loss as of the loss of bargain method?
>
> A. It's as of each month that the loss would have been sustained. So it's -- the interest is calculated from the end of each month that it would have been generated. It's on a monthly basis throughout 2015. . . . And also if the purchases would have been conducted on a monthly basis to meet the volumes that were required to be sold, that's when the profits would be generated for -- and known for that month's transaction.

Exhibit N, Solomon Depo. at 77:7-12, 78:4-8. Mr. Solomon's failure to use coal price(s) as of December 18, 2014 as the basis for the $6,517,720 damage calculation is in contravention of the liquidated damages provision's at-time-of-breach requirement.

BTG's damage calculation is also flawed because it is based on the alleged price BTG would have *paid* for coal *to supply* the EDF contract, not the price that BTG could have *re-sold* the coal it had already purchased for EDF at the time of EDF's alleged breach. The liquidated damages provision assumes that if a buyer breaches, the seller already has the coal in hand (or under contract, at least) and needs to resell it after a buyer's failure to accept delivery (*i.e.*, "at the time of Buyer's breach"). BTG's alleged purchase price for coal it would have purchased

*after* the date of alleged breach to supply EDF during the purported contract term is neither relevant nor applicable to the calculation of liquidated damages. Accordingly, BTG's $6,517,720 damage model should be stricken from consideration by the trier of fact. *Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513, 515 (5th Cir. 2013) ("Expert testimony that relies on completely unsubstantiated factual assertions is inadmissible.").

    **B.**    **BTG's $6,517,720 damage calculation does not provide BTG's damages "at the time of breach," as required by New York law and the U.C.C.**

BTG's $6,517,720 damage calculation's failure to calculate damages as of the date of the alleged breach is in contravention of New York law and the U.C.C. The basic rule for calculating damages for breach of contract under New York law is to calculate as of the date of breach. *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 262 (2d Cir. 2002). Further, New York courts have "explicitly upheld damage awards based on what knowledgeable investors *anticipated* the future conditions and performance would be at the time of the breach and have rejected awards based on what the *actual* economic conditions and performance were *in light of hindsight*." *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 826 (2d Cir. 1990) (emphases added).

4358633v1/014664

New York U.C.C. § 2-708(1)[4] also limits a seller's damages for non-acceptance or repudiation of goods by the buyer to "the difference between the market price *at the time and place for tender* and the unpaid contract price together with any incidental damages provided in this Article (Section 2-710), but less expenses saved in consequence of the buyer's breach" (emphasis added). Courts applying § 2-708(1) have accordingly found that the non-repudiating party's damages should be calculated as of the date of alleged repudiation. *See, e.g.*, *Integrated Circuits Unlimited v. E.F. Johnson Co.*, 875 F.2d 1040, 1042 (2d Cir. 1989) (calculating damages under § 2-708 as of time of buyer rejection); *InterChem Asia 2000 Pte. Ltd. v. Oceana Petrochemicals AG*, 373 F. Supp. 2d 340, 351 (S.D.N.Y. 2005) (same).

As discussed *supra* Section A, BTG calculated its $6,517,720 claim not from the date of alleged breach, but by using actual 2015 prices for coal that would not have been known until the end of 2015, over a year after EDF's alleged repudiation. Exhibit N, Solomon Depo. at 77:7-12, 78:4-8 ("It's [calculated] on a monthly basis throughout 2015. . . . And also if the purchases would have been conducted on a monthly basis to meet the volumes that were required to be sold, that's when the profits would be generated for -- and known for that month's

---

[4] BTG may contend that its $6,517,720 damage calculation is more accurately described by U.C.C. § 2-708(2)'s calculation of lost profit, rather than § 2-708(1), because § 2-708(1) "is inadequate to put the seller in as good a position as performance would have done." But BTG's $6,517,720 damage calculation does not reflect BTG's "actual profit" because it constitutes a windfall that puts BTG well above the $600,600 it would have received if EDF had fully performed under the purported contract. See *infra* Section C.

transaction."). Neither New York law nor the U.C.C. supports the use of hindsight evidence rather than prices as of the date of alleged repudiation for damage calculation. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful," and should be excluded. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 275 (5th Cir. 1998).

### C. BTG's $6,7517,720 damage calculation does not provide BTG's "direct actual damages," as required by the Coal Annex's limitation of liability provision.

Even if the trier of fact found that the Coal Annex's liquidated damages clause was not a proper measure of BTG's damages in this instance, BTG's $6,517,720 damage calculation still fails because the Coal Annex's limitation of liability provision becomes BTG's sole remaining remedy,[5] and $6,517,720 is not an accurate reflection of BTG's direct actual damages.

The Coal Annex's limitation of liability provision states, "IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED HEREIN OR IN A COAL TRANSACTION, THE OBLIGOR'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY." Exhibit H § (f) (EDF-001612). In other words, if the Coal Annex's liquidated damages provision is not the

---

[5] The "Payments on Early Termination" and "Loss" calculations in the ISDA master agreement do not apply to BTG's breach of contract claim because BTG did not elect to pursue an early termination remedy, which would have required BTG to select a designated "Early Termination Date" and notify EDF of BTG's selection with 20 days' notice. Exhibit O § 6 (EDF-001597). Furthermore, the Coal Annex is the more specific governing document that provides the exclusive remedy for physical coal transactions. Exhibit H Appendix 1 § (3) (EDF-001623).

appropriate calculation of damages, then the limitation of liability provision limits BTG to seek only direct actual damages. But Mr. Solomon's $6,517,720 damage calculation is not a determination of BTG's "direct actual damages" because it does not take into account the cost that BTG agreed to pay Revelation for the coal that was to be supplied to EDF.

BTG booked the EDF transaction against the Revelation transactions. *See, e.g.*, Exhibit E at BTG_001456 ("Q1 Revelation trades of 44k tonnes per month were deleted on the 31st. This left the position in the system short 44k tonnes per month for q1 (edf trades still in the system). The remaining 66k tonnes of fixed price q1 revelation trades were also deleted but these were replaced by 66k tonnes booked under MR Coal."). BTG's Ron Shoop testified that BTG maintained a balanced position in its books, so that the amount of coal BTG is buying is matched to purchasers for that coal:

> Q. Okay. So the idea is that the position is balanced. The -- the amount of coal that BTG is buying from various sources, it has people to whom it's selling that same amount of coal, correct?
> A. For physical deliveries.
> Q. Right.
> A. Yes.
> Q. So the physical deliveries match?
> A. Yes.

Exhibit C, Shoop Depo. at 92:18-93:1; *see also id.* at 53:10-15 ("Q. So to the extent BTG was obligated to physically deliver coal to EDF, would you agree that the only coal that was available that had actually been purchased by BTG was the

coal transaction with Revelation Energy?  A. Yes.").  When EDF cancelled the transaction with BTG, BTG exercised its third-party purchaser contingency option and cancelled its coal purchase with Revelation.  Exhibit Q.  Accordingly, BTG was under no obligation to purchase or take delivery of any coal from Revelation that it had intended to resell to EDF.

Yet for his $6,517,720 damage calculation, Mr. Solomon claims that BTG's cancellation of the Revelation transaction means that BTG's transaction with EDF would have been unhedged and therefore fulfilled through monthly purchases of coal on the spot market.  Dkt. 32 at ¶¶ 6, 16-17; Exhibit N, Solomon Depo. at 22:10-15.  But this calculation does not put BTG in the position it would have been in if EDF had performed its side of the contract.  BTG could cancel its coal purchase agreement with Revelation *only if EDF cancelled first*, per the Revelation agreement's third-party purchaser contingency option.  Exhibit D  ¶ 17 (BTG_001480). In other words, if EDF had not cancelled the transaction, BTG could not have exercised its third-party purchaser contingency option to cancel its agreement with Revelation and would have been required to purchase the Revelation coal.  In that circumstance, BTG's expectation damages would only have been $600,600, the profit that would have made if the Revelation coal had been re-sold to EDF.   BTG's $6,517,720 damage calculation is based on the fundamentally flawed premise that BTG would have used monthly spot market

purchases for EDF's coal, and therefore should be stricken. *Moore*, 547 F. App'x at 515 ("When an expert's testimony is not based upon the facts in the record but on altered facts and speculation designed to bolster a party's position, the trial court should exclude it.").

Furthermore, BTG's $6,517,720 damage calculation provides it with an inappropriate windfall from the litigation. U.C.C. law prohibits a party from using its breach-of-contract damage calculation to put itself in a position above where it would have been had the breaching party performed. Specifically, where a seller has contractually protected itself, or hedged, against market price fluctuation, courts applying the U.C.C. have concluded that permitting the seller to reap a riskless benefit is fundamentally unfair and have disallowed such damage calculations. In *Union Carbide Corporation v. Consumers Power Company*, 636 F. Supp. 1498, 1501, 1504 (E.D. Mich. 1986), the court restricted the plaintiff to actual lost profits damages under U.C.C. § 2–708(2) because the plaintiff had hedged its position and had not assumed the risks of a market fluctuation in the price of oil. Therefore, calculating damages as the difference between the contract price and the market price during the term of the contract would have overcompensated the plaintiff with the benefit from a shifting market position in its favor. *Id.*

Likewise, *Diversified Energy, Inc. v. Tennessee Valley Authority*, 339 F.3d

4358633v1/014664

437, 446 (6th Cir. 2003), the court declined to award a market-based damage calculation to a coal supplier acting as a "jobber" with a separate fixed-price contract for its coal supply because the plaintiff "did not assume any risk that the market price of coal would increase." In so doing, the court noted, "A non-breaching party is entitled to be placed in *the same position it would have enjoyed had the defendant abided by the contract*, but is not entitled to *more* than the benefit of his bargain. A damage award which fails to adhere to this principle is unreasonable as a matter of law. The U.C.C., including § 2–708, has adopted this philosophy." *Id.* (citations omitted) (emphasis added).

*Purina Mills, L.L.C. v Less*, 295 F. Supp. 2d 1017, 1044 (N.D. Iowa 2003) concerned a seller who "bargained to be insulated from market fluctuations" by entering into a fixed price supply contract with a third party to supply the contract at issue: "If all parties had performed their roles, the only party who would be affected by fluctuations in the market price would be the [third-party] supplier." But after learning that the buyer had repudiated, the seller refused an option extended by the third-party supplier to buy out of their agreement, and therefore remained contractually bound to accept the contract goods from its supplier after the buyer's breach. *Id.* Because it was only the seller's decision to forego the third-party buyout *after* learning of the buyer's breach that "forced [seller] into the uncertain ebb and flow of the marketplace," seller was not entitled to the benefit of

that market's fluctuation as damages and was therefore limited to a lost profits calculation. *Id.* at 1044-47.

BTG's $6,517,720 damage calculation is likewise unreasonable as a matter of law. It ignores that the only reason BTG has an "unhedged" position for the proposed EDF deal is because BTG triggered the third-party purchaser contingency language in its contract with Revelation that cancelled the coal intended for EDF. BTG's direct actual damages therefore comprise the difference in the purchase price BTG agreed to pay to Revelation and the sale price BTG expected to receive from EDF, or $600,600. BTG confirms this calculation in its own internal documents. Exhibit E at BTG_001457; Exhibit F. But $600,600 is *less than a tenth* of BTG's $6,517,720 damage calculation. BTG is not permitted to capitalize on the coal market's favorable 2015 pricing when its transactions with Revelation hedged against *any* market movement and would have shielded BTG from any unanticipated profits based on the downward trend in coal prices during 2015.

Put simply, the U.C.C. bars BTG from claiming as damages the benefit of an unhedged coal market position where the market moved in its favor, as BTG would not have benefited from such market moves absent EDF's cancellation. Because BTG's $6,517,720 damage calculation has no relation to the facts in the record, it should be stricken from consideration by the trier of fact. *Moore*, 547 F. App'x at

515; *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 389 (5th Cir. 2009) (affirming exclusion of expert opinion that relied on false assumptions rebutted by undisputed record evidence).

## CONCLUSION

The applicable damage provisions in the ISDA master agreement's Coal Annex do not permit BTG's assertion of a $6,517,720 damage calculation. This calculation relies on prices at which BTG claims it would have *purchased* coal to supply to EDF, but the Coal Annex's liquidated damages calculation is based on coal *resale* prices. And the Coal Annex's limitation of liability provision permits BTG to assert only direct actual damages, but $6,517,720 is more than *ten times* BTG's actual damages. BTG is attempting to capitalize on favorable 2015 coal market movement where its position with EDF would have been shielded from such movement had EDF performed under the purported contract. Such a windfall is not permitted under the Coal Annex, or New York law. For these reasons, this Court should strike BTG's $6,517,720 damage calculation from the trier of fact's consideration.

DATED: June 17, 2016

Respectfully submitted,

By: */s/ Katherine H. Kunz*
Katherine H. Kunz
State Bar No. 24083337

4358633v1/014664

kkunz@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone:  (713) 651-9366
Facsimile:  (713) 654-6666

Attorney-in-Charge for Defendant,
EDF Trading North America LLC

OF COUNSEL:
Vineet Bhatia
State Bar No. 00795976
vbhatia@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone:  (713) 651-9366
Facsimile:  (713) 654-6666
Attorneys for Defendant

## CERTIFICATE OF CONFERENCE

In accordance with Rule LR7D counsel for Defendant, EDF Trading North America LLC has conferred with counsel for Plaintiff on June 9 and 10 and counsel for Plaintiff is opposed as to the disposition of the matters raised in this motion.

*/s/ Katherine H. Kunz*
Katherine H. Kunz

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 17, 2016, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Southern District of Texas, using the electronic filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ Katherine H. Kunz*
Katherine H. Kunz

4358633v1/014664